Receipt number 9998-5417010

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BUTTE COUNTY, a unit of local government in the State of Idaho | Civil Action No.   **19-800 C** |
| Plaintiff, | |
| v. | COMPLAINT |
| THE UNITED STATES of AMERICA, | |
| Defendants. | |

## I.      <u>INTRODUCTION</u>

1.      This matter arises out of a failure to comply and act by the Department of Energy pursuant to the Nuclear Waste Policy Act of 1982.  Plaintiff, Butte County asks this Court to find that Plaintiff is entitled to portions of fees required to be calculated and collected by the Department of Energy under the terms of a contract for interim storage pursuant to the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.,* that was not paid to Plaintiff, Butte County, as required by Subtitle B of the Nuclear Waste Policy Act, 42 U.S.C. § 10156(e).

2.      Enacted on January 7, 1983, Congress created the Nuclear Waste Policy Act to provide a framework for dealing with the mounting problems involving the storage of highly radioactive nuclear materials and spent nuclear fuel from commercially operated nuclear power plants across the U.S.  The legislation was also, in part, motivated by the incident at Three Mile

COMPLAINT

Island nuclear power plant in Pennsylvania involving the partial melting of fuel rods in the core of one of the two reactors known as the TMI-2 reactor, which created an immense national concern regarding the safety of nuclear power and radioactive materials.  Subsequently in 1984, the Department of Energy entered into a contract to accept the spent nuclear fuel from the damaged TMI-2 reactor core and transported the waste for temporary storage in Butte County at the Idaho National Laboratory ("INL").

3.      High-level radioactive waste is one of two things: first, spent nuclear reactor fuel; and second, materials remaining after spent nuclear reactor fuel has been reprocessed.  Spent Nuclear Fuel is used fuel removed from a reactor after fission begins to slow to an inefficient rate.  Reprocessing of spent fuel no longer occurs on a commercial scale in the U.S., but may again be considered in the future with advancement in technology.  Reprocessing spent fuel is the attempt to extract isotopes that can be used again as reactor fuel.  Spent Nuclear Fuel is highly radioactive and in most cases will remain dangerously radioactive for thousands of years.

4.      Approximately 80,000 metric tons of high-level radioactive waste in the form of commercial spent nuclear fuel is currently being stored across the United States on a temporary basis awaiting permanent disposal.  Currently, the Department of Energy has failed to comply with the 1998 deadline as set forth in various contracts with utilities to accept all commercial spent nuclear fuel.  The Department of Energy's current liability to utilities for missing this deadline is several billion dollars and increasing each year.

COMPLAINT

5.     The Department of Energy's failure to comply with the Nuclear Waste Policy Act with regard to Subtitle B[1] has harmed and continues to harm Butte County and the residents it serves.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to the Tucker Act 28 U.S.C.A. § 1491, because Section § 10156(e) is a money mandating statute providing that, when certain annual conditions are met, the Secretary and the Department of Energy "shall make annual impact assistance payments"  and because the claims arise out of laws of the United States.

## III.     PARTIES

7.     Plaintiff, Butte County, located in the State of Idaho, was established in 1917 as a unit of local government pursuant to Article XVIII of the Idaho Constitution.   Butte County was named after the Big Southern Butte, which rises dramatically above the expansive sagebrush steppe called the Snake River Plain and towers over the southwestern flank of the INL.   Butte County has a rich natural history of wild, naturally occurring environmental conditions and beauty, as well as agriculture, mining, and science, and the ancestral home of native peoples which include, among others, the Shoshone, Bannock, and Flathead tribes.   Butte County enjoys vast areas where unique naturally occurring ecological conditions can still be found, such as the other worldly landscape and unique ecosystem of Craters of the Moon National Monument, the State of Idaho's only National Monument, which is contrasted by stunningly beautiful and pristine alpine areas in northern Butte County rising over 12,000 feet above sea level.   Butte

_____
[1] 42 U.S.C. § 10151 *et seq.*

Page 3 of 24

COMPLAINT

County also has a dynamic scientific community with residents having specialized knowledge in natural resources as well as physics and engineering.   Butte County's culture and economic livelihood, for better or worse, are now inextricably linked to and dominated by the INL.

8.      Defendant is the United States.

9.      The Department of Energy is an Executive Agency of the United States headquartered in Washington D.C. The Department of Energy administers programs, among other things, pursuant to the Nuclear Waste Policy Act and the Atomic Energy Act.  The Secretary of Energy is responsible for the administration, operations and activities of the Department of Energy.

## IV.      GOVERNING LAW

**The Nuclear Waste Policy Act of 1982.  42 U.S.C. §§ 10101, *et seq.***

10.      The Nuclear Waste Policy Act of 1982's primarily goal was to provide for a comprehensive program requiring the Department of Energy to begin surveying, siting and developing the use of deep geologic repositories for the permanent disposal of high-level nuclear waste or commercial spent nuclear fuel.

11.      Subtitle B of the Nuclear Waste Policy Act established a framework for a program to provide for interim storage of commercial spent nuclear fuel until such time as the permanent repository would begin accepting spent nuclear fuel for permanent disposal.  The Interim Storage provisions of the Nuclear Waste Policy Act require the generators of the spent nuclear fuel to provide temporary storage at the site of the reactor generating the spent nuclear fuel unless storing the waste at the reactor would be unfeasible or interfere with the operations of the plant.

COMPLAINT

12.     Subtitle B also required the Department of Energy to offer 1900 metric tons of interim storage at federally owned sites to prevent disruptions at civilian nuclear power plants or when storage at the reactor site is determined to be environmentally unsound, such as Three Mile Island.  Subtitle B of the Nuclear Waste Policy Act sets forth the terms and conditions of contracts for the Department of Energy to employ in implementing the Interim Storage Program of spent nuclear fuel at federal installations, which includes among other things, that the costs of interim storage of spent nuclear fuel at federally owned sites would be borne by the commercial power generator and not the Department of Energy.  The Interim Storage Program requires the Department of Energy to collect the fees from the commercial power generator pursuant to the contract and deposit the payment into the Interim Storage Fund with the Department of Treasury for administration of the Interim Storage Program. [2]

13.     The public perception of nuclear waste, being very negative because of the immense adverse effects to human health and the environment, was known by Congress to cause social and economic concern.  Congress intended to mitigate this concern, for purposes of the Interim Storage Program, by providing for impact assistance to those communities forced to identify with receiving nuclear waste.

14.     Subtitle B of the Nuclear Waste Policy Act mandates that the Secretary shall make annual impact assistance payments to states, units of local government or both, having jurisdictional boundaries around the interim storage facility and provides for a formula for making such payments.[3]

---

[2] 42 U.S.C. § 10156(a)
[3] 42 U.S.C. § 10156(e)

COMPLAINT

15.     Section 136 of Subtitle B provides for a method of calculating the annual impact assistance payment set by either ten (10%) percent of the cost of storage or $15 per kilogram of spent nuclear fuel, whichever is less.  The total of the latter rate is likely substantially less than the former rate regarding the costs of transport and storage of TMI-2 at INL.[4]

16.     The Nuclear Waste Policy Act limited the Department of Energy to enter into contracts for Interim Storage to a period of time between 1983 and 1990.

## V.     STATEMENT OF FACTS AND BACKGROUND

17.     The  Idaho National Laboratory ("INL") is one of several major Department of Energy installations across the United States.  In 1943, the United States Navy began to utilize the Department of Interior lands in Butte County for naval training activities.  In 1949 more federally owned lands were utilized in Butte County for Atomic Energy Act activities at an installation known as the National Reactor Testing Station inside what is now called the Idaho National Laboratory or INL.  The INL has also been known in the past as the Idaho National Engineering Laboratory or INEL as well as the Idaho National Engineering and Environmental Laboratory or INEEL.

18.     The Idaho National Laboratory, which is commonly referred to presently as INL, has a long history of scientific advancement, which includes the first electricity generated from Nuclear energy by Experimental Breeder Reactor #1 in 1951 as well as the first nuclear reactor

---

[4] 1984 Federal Interim Storage Fee Study: A Technical and Economic Analysis (July 1984 - Prepared by E.R. Johnson Associates, Inc. for Pacific Northwest Laboratory under Contract DE-AC06-76RLO 1830 with the U.S. Department of Energy)

COMPLAINT

used to generate civilian electricity on January 17, 1955 when the Borax III reactor came online and powered the City of Arco for more than an hour.

19.     The Idaho National Laboratory, unfortunately, also has a troubling history of mismanagement resulting in a legacy of permanent environmental contamination of land and water in Butte County by radioactive and hazardous chemical waste.

20.     The Department of Energy and Butte County now share overlapping and concurrent jurisdiction over the portions of the Idaho National Laboratory inside the boundaries of Butte County, respectively.

***The Department of Energy Entered into a Contract in 1984 for the Interim Storage of Commercial/Civilian Spent Nuclear Fuel and High-Level Radioactive Waste at the Idaho National Laboratory in Butte County***

21.     On March 28, 1979, the Three Mile Island nuclear power plant experienced partial melting of the fuel rods in one of two of the reactors at the Three Mile Island power plant known as the TMI-2 reactor.  The entire nation shuttered at the prospect of the unknown risks and dangers from radioactive materials, but very little radioactive gas was released and no measurable health risk to the surrounding population was documented .[5]

22.     In 1982, the Department of Energy began exploring options to mitigate the issues created by the Three Mile Island incident with a non-binding agreement in principle with General Public Utilities Nuclear Corp. ("GPU"), the owners of the Three Mile Island power plant.  The agreement "in principle" initiated negotiations between the Department of Energy and the utility and signaled the intent of the Department of Energy to accept certain materials

_____

[5] Report of The President's Commission On The Accident at Three Mile Island (1979)

COMPLAINT

from the TMI-2 reactor site for research purposes and storage.  This one page document stated

that the duration of the research would take approximately 3-5 years and was silent as to the

location of the research or storage as well as stating the agreement was contingent upon

negotiations and execution of an actual separate written contract between the Department of

Energy and GPU, which would provide the actual details of the potential future transaction.  The

Agreement in Principle contained no definite terms, such as cost of various aspects of the

proposed transaction, the timing of any aspect of the proposed transaction, and expressly stated

the parties' intent to agree was "contingent" on the negotiation of the actual terms of the

proposed transaction in addition to a future contract.[6]  The method and feasibility of removing

the damaged TMI-2 core was, in March of 1982, still incomplete and unknown. [7]

23.     Additionally in 1982, the Department of Energy and the Nuclear Regulatory

Commission ("NRC") entered into a Memorandum of Understanding ("MOU") regarding the

cleanup and management of TMI-2.  The primary objective of the MOU was to make efforts to

prevent Three Mile Island from becoming a spent nuclear fuel storage area.[8]

24.     The Department of Energy provided support responding to the incident for public

safety expertise as well as research, and planning the cleanup efforts.  The cleanup plan had three

basic phases.  Phase one was stabilization or protecting public health and gathering data to secure

any ongoing safety concerns with the damaged reactor.  Phase two was defueling the reactor.

Defueling involved determining the feasibility of removing the reactor core, planning, then

[6] Historical Summary of the TMI-2 Core Debris Transportation Campaign (1993)
[7] Report by the General Accounting Office (EMD-82-28) January 15, 1982 *See* Appendix I
[8] Memorandum of Understanding Between the U.S. Nuclear Regulatory Commission and the
U.S. Department of Energy Concerning the Removal and Disposition of Solid Nuclear
Wastes from Cleanup of the Three Mile Island Nuclear Plant (March 19, 1982)

COMPLAINT

1
2
3
4
5
6
removing the reactor core, and disposing of the highly radioactive waste materials.  The feasibility and required resources to remove the TMI-2 core was unknown until 1985 when more detailed information regarding the condition of the components within the core was obtained after the reactor vessel head was removed in mid 1984.  Phase three is storage and decommission.[9]

7
8
9
10
25.     The Department of Energy accepted high-level radioactive waste from TMI-2 for two distinct purposes, the first being the research program, which began during the stabilization phase and continued through defueling.  However, the additional purpose for the overwhelming

11
12
13
majority of the spent nuclear fuel from TMI-2 was merely for temporary and permanent disposal, which continues to be temporarily stored in Butte County since the late 1980s.[10]

14
15
16
17
18
26.     There are few public documents or public information remaining related to the transaction and financing of accepting, transporting and disposal of spent nuclear fuel from TMI-2.  The Department of Energy has never provided or published specific financial figures to the public showing the cost of storage of TMI-2 spent nuclear fuel in Butte County.

19
20
21
22
23
27.     The Department of Energy's non-binding Agreement in Principle with the power utility and the MOU with the Nuclear Regulatory Commission were the only documents executed between the Department of Energy and another party referring to a potential future plan for disposal of the TMI-2 waste prior to 1983.

24
25
26
28.     On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA") became law.

27
28
_____

[9] Historical Summary of the TMI-2 Core Debris Transportation Campaign (1993)
[10] id.

COMPLAINT

29.     The Department of Energy had already acquired very small portions of

radioactive materials from TMI-2 for research purposes prior to the Nuclear Waste Policy Act

becoming law, but the Department of Energy had not entered into any contracts, or binding

obligations to accept the entire core or any other commitments made to store the entire TMI-2

core at INL or what was required to safely remove the core. [11]

30.     In 1984 and after the Nuclear Waste Policy Act became law, the Department of

Energy entered into a detailed and binding contract with GPU to accept the entire core of the

TMI-2 reactor, known as the "core contract."[12]  On May 22, 1984, only days after the

Department of Energy signed the binding contract to accept the entire TMI-2 core, Department

of Energy Assistant Secretary Dr. Shelby T. Brewer testified at a hearing before the U.S. House

of Representatives Subcommittee on Energy Research and Production regarding the contract

with GPU for the transportation and storage of the TMI-2 core.  Appointed by President Reagan,

Dr. Shelby Brewer was considered to be the President's top official on nuclear issues.[13]  Assistant

Secretary Brewer's prepared statement was submitted to the subcommittee and read by Assistant

Secretary Brewer into the record, which included in relevant part:

> "All the residual waste from the cleanup wastewater, of the spilled water, has been
> removed, was removed from the site and is out of State as of last August.
> ***Moreover, I have recently signed a contract with the utility to accept***
> ***responsibility for the damaged core under the terms consistent with***
> ***the Waste Policy Act of 1982.  We are taking the entire core; not just the***

---

[11] Historical Summary of the TMI-2 Core Debris Transportation Campaign (1993)
[12] *id.*
[13] Brownstein and Easton, Reagan's Ruling Class : Portraits of the President's Top One
Hundred Officials, Presidential Accountability Group, 1982.

COMPLAINT

*piece for research and development purposes; we are taking the entire core under the terms of the 1982 act.*"[14] *(emphasis added)*

31.    During the hearing on May 22, 1984, while in the context of discussing the financial aspects of the TMI-2 contract with Congressman Robert S. Walker of Pennsylvania, Assistant Secretary Brewer again responded:

> "Mr. Walker: You state that the core from TMI will undergo careful examination at the Idaho National Engineering Laboratory.  Who is going to fund that examination?
> Dr. Brewer:  We will fund all the research and development funding for the examination.  *We will charge the utility and have, in fact, signed a contract for the transportation and storage of the core, just like we would any other fuel under the Waste Management Act of 1982.*"[15] *(emphasis added)*

32.    Assistant Secretary Brewer also entered into the hearing record his letter addressed to Edison Electric Institute, an entity that represents power utilities internationally, dated April 17, 1984, which discussed the costs of the TMI project among other things, and Edison Electric Institute's (financial) TMI-2 pledge program.  In this letter, the Assistant Secretary affirms the Department of Energy's position on TMI-2 and differentiates the Department's statutory authorities pursuant to the Atomic Energy Act and the Nuclear Waste Policy Act of 1982:

> "In addition to conducting R&D of generic benefit under the authorization provided by the Atomic Energy Act (1954) and subsequent legislation, we have also stepped up promptly, in this case, to our operational responsibilities to provide a means for disposal of wastes.  We have agreed to accept title of the damaged

---

[14] Lessons Learned in Utility Management and the Status of the R & D Program Following the Accident at Three Mile Island - HEARING - Before the Subcommittee on Energy Research and Production of the Committee on Science and Technology - House of Representatives, Ninety-Eighth Congress, Second Session, May 22, 1984, at page 23.
[15] *id*. at page 36.

COMPLAINT

fuel, not merely a portion of it for R&D purposes, under the provisions consistent with the Waste Policy Act of 1982."[16]

33.    Assistant Secretary Brewer also signed the non-binding Agreement in Principle on behalf of the Department of Energy in March of 1982, which eventually led to the the 1984 core contract.

34.    From 1986-1990, pursuant to the 1984 contract (and 1987 amendment), the Department of Energy took possession of the TMI-2 spent fuel from GPU and transported the materials across the United States to Butte County for storage. [17]

35.    There is no public information showing that funds or contract proceeds have been placed in the Interim Storage Fund for the storage of the TMI-2 materials, nor has the Department of Energy requested an appropriation from Congress to fulfill the objectives of the Interim Storage Program.

36.    In 1983 and in subsequent years, the Department of Energy prepared guidelines regarding fees for the Interim Storage Program published in the Federal Register.  The Department of Energy also conducted a fee study for the Interim Storage Program during the years between 1983 and 1990.  The studies and guidelines provided fee schedules, which included impact assistance payments as well as an analysis of how impact assistance payments would be funded by the fee rates that the Department of Energy intended to implement and follow for the Interim Storage Program.

---

[16] *id*. at page 42.
[17] Historical Summary of the TMI-2 Core Debris Transportation Campaign (1993)

COMPLAINT

37.     Thus, the Department of Energy had a fee schedule, as required by the Nuclear

Waste Policy Act[18], available in 1984 when the contract for the TMI-2 core was executed by the

parties.  The fee schedule created by the Department of Energy provided for, among other things,

the amount per kilogram of high-level radioactive waste for payments as well as payment timing

and estimated duration of interim storage.[19]

38.     The reasons why the Department later failed to place the fees in the Interim

Storage Fund, after Asst. Sec. Brewer clearly indicated that the TMI-2 spent nuclear fuel was

accepted pursuant to the Nuclear Waste Policy Act of 1982, are unknown to Butte County and

the general public.

39.     Strangely, the Department of Energy has stated, in response to a request for public

information, that the core contract was destroyed pursuant to its document retention policies.

Apparently the core contract was destroyed while other more obscure, contemporaneous

documents relating to the Department's involvement in TMI-2 were retained including the 1982

Agreement in Principle, which is publicly available on the Department of Energy's digital library

under the heading "Agreement to Accept the TMI-2 core," as well as the 1984 agreement to

allow Japan to participate in research on the TMI-2 materials, and many thousands of other

documents regarding the Department of Energy's involvement with TMI-2 from the same time

period as the 1984 core contract.   An appendix of the core contract was included as part of the

Department of Energy's 1993 publication called "Historical Summary of Three Mile Island,"

which is the only publication made by the Department discussing the nature of the core contract,

---

[18] 42 U.S.C. § 10156(a)(2)
[19] Spent Nuclear Fuel from Civilian Nuclear Power Plants; Federal Interim Storage; Payment
Charges, 1984 FY - 48 Fed. Reg. 54391 (Friday Dec. 2nd 1983)

COMPLAINT

aside from the core contract being mentioned as the transactional instrument to accept the TMI-2

core in the Department of Energy's publication, "Historical Summary of the Fuel and Waste

Handling and Disposition Activities of the TMI-2 Information Examination Program

(1980-1988)"[20] published in 1988.  The Department of Energy, in its response to a request for a

copy of the core contract, stated only that the requested document was destroyed, which is

demonstrably false with regard to one of the appendices as shown by the Department's own

publication.[21]

40.     The financial responsibility and requirement to pay fees by GPU to store the spent

nuclear fuel from TMI-2 at Idaho National Laboratory pursuant to the core contract, or the

timing of the utilities performance under the contract, has not been made public by the

Department of Energy.

41.     The State of Idaho made several attempts to halt spent nuclear fuel and waste

from entering Idaho in the early and mid 1990s, including legal actions.  In 1995, the Department

of Energy and the State of Idaho entered into a settlement agreement, whereby, among other

things, the Department of Energy would remove the TMI-2 spent fuel from Idaho by 2035 as

well as make improvements to the facilities at INL for interim storage of the high-level

radioactive waste, including the TMI-2 materials.

42.     Pursuant to the settlement agreement, the Department of Energy relocated some

of the TMI-2 spent nuclear fuel from wet storage pools at Test Area North in Butte County near

Howe, which were constructed in 1955 to store radioactive materials from the nuclear aircraft

---

[20] Prepared for the U.S. Department of Energy, Idaho Operations Office Under DOE
Contract No. DE-AC07-76ID01570 - EGG-2529, Published October 1988.
[21] Historical Summary of the TMI-2 Core Debris Transportation Campaign (1993)

COMPLAINT

propulsion program, to a more suitable and relatively recently constructed (1998-2001) facility known as the Independent Spent Fuel Storage Installation where much of the TMI-2 core materials reside today.  The Independent Spent Fuel Storage Installation is located at the Idaho Nuclear Technology and Engineering Center, a facility within the INL and Butte County.  The damaged core from TMI-2 as well as other TMI-2 radioactive waste have been stored at different locations within Butte County, and has not been stored in any other locations except within Butte County since being transported from Three Mile Island from 1986-1990.

43.     The State of Idaho's settlement was based upon issues in the Environmental Impact Statement involving the storage of nuclear waste at INL, pursuant to the National Environmental Policy Act.  The settlement did not involve issues regarding the Nuclear Waste Policy Act and spent nuclear fuel from TMI-2.

44.     The Department of Energy applied for and was granted a materials license from the Nuclear Regulatory Commission, license number SNM-2508, to store the 222,278.9 kilograms of highly radioactive spent nuclear fuel from TMI-2 at the Idaho Nuclear Technology and Engineering Center (an installation within INL) in Butte County in 1999 (amended in 2005), expiring in 2019.[22]  In 2017, the Department of Energy applied for a 20 year renewal of the license, four years beyond the Idaho settlement agreement's deadline.

45.     As of the date of this filing, the vast majority of commercial spent nuclear fuel, nearly 80,000 metric tons, is being stored by the generators at the reactor sites across the U.S. Several of the contracts the Department of Energy entered into with utilities to accept spent

---

[22] Nuclear Regulatory Commission License for Independent Storage of Spent Nuclear Fuel and High-Level Radioactive Waste; License No SNM—2508; Reference No 72-20, Issued March 19, 1999.

COMPLAINT

nuclear fuel for permanent disposal provided for a 1998 deadline where the Department of

Energy was to transport the spent nuclear fuel from the temporary storage at the reactor sites for

permanent disposal at a repository.

46.     The permanent repository selected by Congress in the 1987 amendment of the

Nuclear Waste Policy Act is a location known as Yucca Mountain in the State of Nevada.[23]

Construction of the Yucca Mountain facility was not completed and could not begin accepting

waste by the 1998 deadlines.[24]  Yucca Mountain now appears to not be a viable repository for the

permanent disposal of commercial spent nuclear fuel, and in any event has at least been

temporarily disregarded, as a repository by the Department of Energy, primarily based on social

and political reasons.[25]  Given the Congressional selection of the Yucca Mountain repository in

1987 and corresponding funding, the Department of Energy likely did not foresee a need for

more Interim Storage at Federal installations prior to 1990. Thus, the Interim Storage Program

contemplated by the Nuclear Waste Policy Act was not utilized on a larger scale by the

Department of Energy in order to facilitate the end goals of a permanent repository.

47.     The 2014 Government Accounting Office report to Congress on Spent Nuclear

Fuel Management found that the primary obstacles to achieving a long term solution for disposal

of nuclear waste are social and political issues and not technical, financial or logistical.   The

Government Accounting Office, after seeking input from experts and stakeholders,

---

[23] 42 USC § 10172

[24] Viability Assessment of a Repository at Yuuca Mountain (Overview, Vol. 1-9) Department of Energy Office of Civilian Radioactive Waste Management - DOE/RW -508 (December 1998)

[25] id. and Spent Nuclear Fuel Management: Outreach Needed to Help Gain Public Acceptance for Federal Activities that Address Liability, GAO-15-141 Published: Oct 9, 2014. Publicly Released: Nov 12, 2014.

COMPLAINT

recommended that the Department of Energy create a more effective public outreach program

regarding spent nuclear fuel management issues, including perceived risks and benefits.[26]

48.     The only contract that the Department of Energy has entered into for away-from-

reactor interim storage of commercial spent nuclear fuel at a Federally owned installation since

the Nuclear Waste Policy Act became law and between the years 1983 and 1990 is the

Department of Energy's 1984 contract with GPU to accept the entire core of TMI-2, which is

approximately 222 metric tons of high-level radioactive waste, and store the waste, on an interim

basis, at the Idaho National Laboratory in Butte County, Idaho. [27]

49.     The Department of Energy closely adhered to many of the required steps as set

forth in the Nuclear Waste Policy Act to accept spent nuclear fuel at a federal site on an interim

basis awaiting transport to the repository, with the exception that the Department of Energy did

not deposit any proceeds of the contract or any other funds into the Interim Storage Fund and has

never made an annual impact assistance payment to the unit of local government where the

commercial spent nuclear fuel is being stored on an interim basis.  It remains unknown to Butte

County and the general public as to whether the Department of Energy ever collected fees for

interim storage for TMI-2 from the utility.

50.     The Department of Energy has never contacted Butte County regarding the TMI-2

spent fuel storage at INL or conducted a public meeting regarding the TMI-2 storage in Butte

County at any time from 1984 through the filing date of this Complaint.  The Department of

[26] Spent Nuclear Fuel Management: Outreach Needed to Help Gain Public Acceptance for
Federal Activities that Address Liability, GAO-15-141 Published: Oct 9, 2014. Publicly
Released: Nov 12, 2014.
[27] (NRC License No. SNM - 2508) https://www.nrc.gov/docs/ML0609/ML060970079.pdf

COMPLAINT

Energy conducted extensive outreach to communities across the U.S. that the TMI-2 spent

nuclear fuel passed through during transport, but never directly contacted the local community

hosting the ultimate destination of TMI-2.

51.     The Department of Energy has never provided actual notice to Butte County of

any decision or action at any point in the history of storage and licensing of the TMI-2 spent fuel

in Butte County.  Rather, the Department of Energy did provide general public notices, outside

Butte County, as well as relying on general public notices made by the Nuclear Regulatory

Commission.  The Department of Energy has never held a hearing or public meeting or afforded

the opportunity for a hearing on any decision regarding the storage of the TMI-2 spent fuel in

Butte County prior to the Department of Energy's actions regarding the same, since the

Department of Energy contracted in 1984 to bring TMI-2 to Butte County.  For example, a

hearing on the renewal of the license to store TMI-2 at INL in 2018 was held in Maryland by the

Nuclear Regulatory Commission.  Butte County was treated as any other ordinary member of the

general public.

## VI.     CLAIMS FOR RELIEF

### Count One

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

52.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth

herein.

53.     The Nuclear Waste Policy Act requires the Department of Energy to provide

interim storage of commercial spent nuclear fuel at Federal installations, with specific

Page 18 of 24

restrictions and conditions, in the event storage at the commercial reactor site is imprudent. 42

U.S.C. § 10155.

54.     The Secretary of Energy was authorized by the Nuclear Waste Policy Act from

1983 to 1990 to offer contracts to utilities to provide interim storage of commercial spent nuclear

fuel at Federal installations pursuant to the restrictions and conditions within 42 U.S.C. § 10156.

Subject to the capacity permitted and other statutory limitations, Section 10156(a)(1) provides in

pertinent part:

> "(1)     Each such contract shall (A) provide for payment to the Secretary of fees
> determined in accordance with the provisions of this section;"

and, Section 10156(c), then limits the use of these fees as follows:

> "(c) Establishment of Interim Storage Fund. There hereby is established in the
> Treasury of the United States a separate fund, to be known as the Interim Storage
> Fund. The Storage Fund shall consist of--
> (1) all receipts, proceeds, and recoveries realized by the Secretary under
> subsections (a), (b), and (e), which shall be deposited in the Storage Fund
> immediately upon their realization;
> (2) any appropriations made by the Congress to the Storage Fund; and
> (3) any unexpended balances available on the date of the enactment of this Act
> [enacted Jan. 7, 1983] for functions or activities necessary or incident to the
> interim storage of civilian spent nuclear fuel, which shall automatically be
> transferred to the Storage Fund on such date."

55.     Section 10156(d), again, provides direction and limitations on the use of these

fees collected from contracts, creating a duty for the Secretary to protect the amounts due for

impact assistance payments from other expenditures from the fees determined in Section

10156(a), as follows:

COMPLAINT

"(d)  Use of Storage Fund. The Secretary may make expenditures from the Storage Fund, ***subject to subsection (e)***, for any purpose necessary or appropriate to the conduct of the functions and activities of the Secretary, or the provision or anticipated provision of services, under this subtitle [42 USCS §§ 10151 et seq.], including--

(1)  the identification, development, licensing, construction, operation, decommissioning, and post-decommissioning maintenance and monitoring of any interim storage facility provided under this subtitle [42 USCS §§ 10151 et seq.];

(2)  the administrative cost of the interim storage program;

(3)  the costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at an interim storage site, consistent with the restrictions in section 135 [42 USCS § 10155];

(4)  the cost of transportation of spent nuclear fuel; and

(5)  impact assistance as described in subsection (e)" ***(emphasis added)***

56.     The Department of Energy contracted to accept and store commercial spent nuclear fuel from GPU in 1984, and amended in 1987, pursuant to the Nuclear Waste Policy Act. The approximately two hundred twenty two thousand, two hundred seventy eight (222,278.9 kg) kilograms of Spent Nuclear Fuel from Three Mile Island was transported to the Idaho National Laboratory in Butte County for interim storage between 1986 and 1990 where it continues to be stored through the date of this filing.

57.     However, the Department of Energy, at some unknown point after the core contract was executed in 1984 and was declared by the Department of Energy to be in compliance with and subject to the provisions of the Nuclear Waste Policy Act, then failed to comply with the provisions of Section 10156.

58.     The Department of Energy had not entered into any binding contract to accept spent nuclear fuel for storage purposes from Three Mile Island prior to DOE Contract No. DE-SC07-ID12355, also know as the "core contract" executed in March, 1984 by Assistant Secretary of Energy Dr. Shelby T. Brewer.

COMPLAINT

1
2
3

59.     Section 10156(e) mandates:

"Impact assistance.

(1) Beginning the first fiscal year which commences after the date of the enactment of this Act [enacted Jan. 7, 1983], the Secretary shall make annual impact assistance payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the jurisdictional [jurisdictional] boundaries of such government or governments and authorized under this subtitle [42 USCS §§ 10151 et seq.]: *Provided, however,* That such impact assistance payments shall not exceed (A) ten per centum of the costs incurred in paragraphs (1) and (2), or (B) $ 15 per kilogram of spent fuel, whichever is less;"

60.     Defendant's failure to make annual impact assistance to Plaintiff in 2013 is unlawful by failing to comply with the requirements of Section 10156.

61.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has harmed and will continue to harm Butte County and the communities and residents it serves.

## Count Two

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

62.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

63.     Defendant's failure to make annual impact assistance to Plaintiff in 2014 is unlawful by failing to comply with the requirements of Section 10156.

64.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has harmed and will continue to harm Butte County and the communities and residents it serves.

COMPLAINT

1
2
3
4

### Count Three

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

5
6

65.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth

7
herein.

8
9

66.     Defendant's failure to make annual impact assistance to Plaintiff in 2015 is

10
unlawful by failing to comply with the requirements of Section 10156.

11

67.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has

12
harmed and will continue to harm Butte County and the communities and residents it serves.

13
14

### Count Four

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

15
16

68.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth

17
herein.

18
19

69.     Defendant's failure to make annual impact assistance to Plaintiff in 2016 is

20
unlawful by failing to comply with the requirements of Section 10156.

21
22

70.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has

harmed and will continue to harm Butte County and the communities and residents it serves.

23
24

### Count Five

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

25
26

71.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth

27
herein.

28

COMPLAINT

72.     Defendant's failure to make annual impact assistance to Plaintiff in 2017 is unlawful by failing to comply with the requirements of Section 10156.

73.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has harmed and will continue to harm Butte County and the communities and residents it serves.

### Count Six

### Violation of Statutory Mandates and Authority, 42 U.S.C. § 10156

74.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

75.     Defendant's failure to make annual impact assistance to Plaintiff in 2018 is unlawful by failing to comply with the requirements of Section 10156.

76.     Defendant's failure and refusal to comply with the Nuclear Waste Policy Act has harmed and will continue to harm Butte County and the communities and residents it serves.

### VI.     PRAYER FOR RELIEF

WHEREFORE, Butte County respectfully asks this Court to enter Judgment in Plaintiff's favor and against Defendant as follows:

A.     Award Butte County monetary relief equal to the Three Million Three Hundred Thirty Four Thousand One Hundred Eighty Three Dollar ($3,334,183) annual impact assistance payment Butte County should have received for each year due and owing beginning 2013 through the date of final judgment in this matter pursuant to Section 10156(e).

B.     Award Butte County any pre-judgment or post judgment interest to the extent available and according to law.

COMPLAINT

C.      Award Butte County its reasonable costs, litigation expenses and attorneys' fees associated with this litigation according to law.

D.      Grant such further relief as the Court deems just and proper in order to provide Butte County with relief and protect the public interest.

Dated: April 22, 2019.                  Respectfully Submitted,


_s/Steve L. Stephens_____
Steve L. Stephens

Stephens Law Office, PLLC
221 West Grand Ave.
PO Box 736
Arco, ID 83213

Attorney for Butte County

COMPLAINT